UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**BRANDON GRAY, SR.**                                                         **CIVIL ACTION**

**VERSUS**                                                                              **NO.   21-1476**

**WARDEN MARCUS MEYERS**                                       **SECTION: "F"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

*Procedural History*

Petitioner, Brandon Gray, Sr., is a convicted inmate currently incarcerated at the Raymond Laborde Correctional Center in Cottonport, Louisiana. On December 3, 2014, Gray was charged by bill of information with five counts of armed robbery and one count of aggravated flight from an officer in violation of La. Rev. Stat. §§ 14:64 and 14:108.1(C).[1] After a trial, on September 22, 2016, a jury found Gray guilty as charged.[2] On October 19,

---

[1] State Rec., Vol. 1 of 12, Bill of Information, 12/3/14.

[2] State Rec., Vol. 1 of 12, Minute Entry, 9/20/16; Minute Entry, 9/21/16; Minute Entry, 9/22/16; Verdicts, 9/22/16; State Rec., Vol. 1 of 12, Trial Transcript, 9/20/16; State Rec., Vol. 2 of 12, Trial Transcript (con't), 9/20/16; State Rec., Vol. 3 of 12, Trial Transcript, 9/21/16; State Rec., Vol. 4 of 21, Trial Transcript (con't), 9/21/16; Trial Transcript, 9/22/16.

2016, Gray was sentenced to 50 years to be served at hard labor for the armed robbery offenses and five years at hard labor for the offense of aggravated flight from an officer, each sentence to be served without benefit of parole, probation, or suspension of sentence and to run concurrently.[3]   The State filed a multiple bill of information as to count one, alleging Gray was a second-felony offender.[4]   After Gray pled guilty to the multiple bill, the trial court resentenced him as to count one to 50 years at hard labor without the benefit of parole, probation or suspension of sentence, to run concurrent with his other sentences.[5]

On direct appeal, Gray's appointed counsel asserted that: (1) the evidence was insufficient to support his attempted armed robbery convictions, (2) the trial court erred in failing to grant a mistrial when the State referenced Gray's right against self-incrimination and (3) the trial court erred in failing to grant a mistrial when the State referenced "other crimes."[6]   Gray filed a pro se brief asserting that: (1) the trial court erred in failing to grant a mistrial based on the remark about his prior criminal record contained in his recorded statement that was played for the jury; (2) the trial court erred in admitting his videotaped post-arrest statement; (3) prosecutorial misconduct; (4) insufficient evidence; (5) the trial court erred in denying his motion to continue the trial; (6) he was prejudiced because he did not have a view of the first row of the jury, and therefore, he could not observe the jurors or lodge objections based on their conduct or inattentiveness; (7) the trial court erred in

---

[3] State Record, Vol. 8 of 12, Minute Entry, 10/19/16; State Rec., Vol. 4 of 12, Sentencing Transcript, 10/19/16.

[4] State Rec., Vol. 8 of 12, Multiple Bill, 12/12/16.

[5] State Rec., Vol. 8 of 12, Minute Entry, 12/12/16; State Rec., Vol. 4 of 12, Multiple Bill and Resentencing Transcript, 12/12/16.

[6] State Rec., Vol. 4 of 12, Appeal Brief, 2017-KA-0166, 5/24/17.

allowing the introduction at trial of photographs of the money that was taken from the bank on October 9, 2014; (8) three officers committed perjury at trial; (9) the trial court erred by not declaring a mistrial after prejudicial racial remarks were made; (11) the trial court committed reversible error by telling the jury that he was guilty of one of the charged offenses, in violation of La. Code Crim. P. art. 770; and (12) the failure to transcribe closing argument prevented him from raising certain issues on appeal.[7]  On December 20, 2017, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[8]

Gray filed an untimely writ application with the Louisiana Supreme Court on February 7, 2018.[9]  On April 16, 2018, the Louisiana Supreme Court refused to consider the writ application citing La. S. Ct. Rule X § 5.[10]

On December 3, 2019, Gray filed an application for post-conviction relief with the trial court.[11]  In that application, he asserted (1) his trial counsel was ineffective for refusing to pursue or present the defense that petitioner requested be presented; (2) his trial counsel was ineffective for failing to investigate alibi witnesses, overlooking an alibi defense, call alibi witnesses, and present exculpatory evidence; and (3) his counsel suffered from a conflict of

---

[7] State rec., Vol. 5 of 12, Pro Se Brief, 2017-KA-0166, 7/19/17.

[8] *State v. Gray*, No. 17-KA-166 (La. App. 5 Cir. 12/20/17), 235 So.3d 1270; State Rec., Vol. 8 of 12.

[9] State Rec., Vol. 12 of 12, La. S. Ct. Writ Application, 18 KH 250, 2/7/18 (signed 1/29/18 and metered 2/2/18).

[10] *State v. Gray,* No. 2018–KH–0250 (La. 4/16/18), 239 So.3d 830; State Rec. Vol. 12 of 12.

[11] State Rec., Vol. 8 of 12, Uniform Application for Post-Conviction Relief and Memorandum in Support.  The memorandum is dated November 3, 2019.  However, the application is dated December 3, 2019.  Both pleadings were received by the state court on December 10, 2019.  State Rec., Vol. 8 of 10, Response to Request for Information and/or Documents, 12/10/19.

3

interest.   On May 5, 2020, the trial court denied relief.[12]

In the interim, on March 20, 2020, Gray sent a letter to the trial court seeking additional time to reply to the State's response and to supplement his application for post-conviction relief.[13]   When the trial court did not respond to the letter, Gray filed a writ application with the Louisiana Fifth Circuit on June 11, 2020.[14]   On July 27, 2020, the Louisiana Fifth Circuit denied the writ application in part and remanded the case for the trial court to consider Gray's supplemental claims that the trial court showed partiality to the State and the non-unanimous jury verdict as to counts one and two violated his constitutional rights.[15]

On January 21, 2021, the Louisiana Supreme Court denied Gray's related writ application.[16]   On January 26, 2021, the Louisiana Supreme Court denied Gray's second writ application.[17]   His requests for reconsideration were not considered.[18]

On March 18, 2021, Gray filed another writ application with the Louisiana Fifth Circuit seeking an order requiring the trial court to comply with the July 20, 2020 mandate.[19]   On

---

[12] State Rec., Vol. 9 of 12, State District Court Order denying post-conviction relief, 5/5/20.

[13] State Rec., Vol. 9 of 12, Letter, postmarked 3/20/20.   The letter was stamped as file by the state district court on May 6, 2020.

[14] State Rec., Vol. 9 of 12, 5th Cir Writ Application, 20-KH-179, 6/11/20 (signed 6/3/20); State Rec., Vol. 10 of 12, Memorandum in Support of Writ Application, 20-KH-179, 6/3/20.

[15] *Louisiana v. Gray*, 20-KH-179 (La. App 5 Cir. 7/27/20) (unpublished); State Rec., Vol. 9 of 12.

[16] *State v. Gray*, 2020-KH-01302 (La. 1/12/21), 308 So. 3d 710; State Rec., Vol 12 of 12.

[17] *State v. Gray*, 2020-KH-01367 (La. 1/26/21), 309 So. 3d 340; State Rec., Vol. 12 of 12.

[18] *State v. Gray*, 2020-KH-01302 (La. 4/27/21), 314 So.3d 837; *State v. Gray*, 2020-KH-01302 (La. 4/27/21), 314 So. 3d 834; State Rec., Vol. 12 of 12.

[19] State Rec., Vol. 11 of 12, Writ Application, 21-KH-130, 3/10/21 (signed 3/8/21).

April 15, 2021, the Louisiana Fifth Circuit again ordered the trial court to allow Gray to supplement his petition and address the supplemental claims.[20] On July 8, 2021, the trial court denied the supplemental claims.[21]

On July 21, 2021, Gray filed the instant application for habeas corpus relief.[22] In that application, Gray claims: (1) ineffective assistance of counsel for failing to interview and call witnesses, present exculpatory evidence, file a motion to sever, and subject the prosecution's case to meaningful adversarial testing; (2) the denial of his application for post-conviction relief violated his rights to due process and equal protection; and (3) the non-unanimous jury verdict as to counts one and two violated constitutional law.[23]

The State argues that the application should be dismissed as untimely.[24] Gray did not file a traverse.

## Analysis

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., governs the filing date for this action because Smith filed his *habeas* petition after the AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997). Title 28 U.S.C. § 2244(d) provides:

> (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

---

[20] *Gray v State*, 21-KH-130 (La App. 5 Cir. 4/15/21) (unpublished); State Rec., Vol. 11 of 12.

[21] State Rec., Vol. 10 of 12, State District Court Order denying supplemental claims for post-conviction relief, 7/8/21.

[22] Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody.

[23] Rec. Doc. 1.

[24] Rec. Doc. 10.

A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Typically, a petitioner must bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final." With regard to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id*. at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a

> result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).

Gray's state criminal judgment of conviction became final for AEDPA purposes on January 19, 2018, 30 days after the Louisiana Fifth Circuit Court of Appeal denied his direct appeal and the time expired for seeking review with the Louisiana Supreme Court.[25] La. S. Ct. Rule X, § 5(a) ("An application seeking to review a judgment of the court of appeal ... after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal"). The AEDPA one-year limitations period commenced on that date and expired one year later.[26] *See Butler v. Cain*, 533 F.3d 314, 317-18 (5th Cir 2008). However, Gray did not file the instant federal habeas petition with this Court until July 21, 2021. Thus, his application must be dismissed as untimely unless the deadline was extended through tolling.

   A. *Statutory Tolling*

The Court finds no basis for statutory tolling in this case. Regarding the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent

---

[25] Although he later attempted to seek further direct review of that judgment by filing a writ application with the Louisiana Supreme Court, he did so after expiration of the 30-day deadline, and the Louisiana Supreme Court refused to consider the writ application, expressly stating: "Writ not considered. Untimely filed pursuant to Louisiana Supreme Court Rule Rule X § 5." *Gray*, No. 2018–KH–0250 (La. 6/16/18), 239 So.3d at 830.

[26] Because the 365th day of the limitations period fell on a Saturday, and Monday, January 21, 2019 was a legal holiday, petitioner's deadline was extended through the following Tuesday, January 22, 2019. *See Flanagan v. Johnson*, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed. R. Civ. P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

7

judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

The first state application Gray filed within that one-year period was the aforementioned untimely Louisiana Supreme Court writ application. However, because that application was seeking further direct review, it did not trigger statutory tolling under § 2244(d)(2). The United States Fifth Circuit Court of Appeals has expressly and conclusively held: "Under that provision it is only state *post-conviction relief* proceedings that cause tolling." *Butler*, 533 F.3d at 318 (emphasis added). Accordingly, an untimely direct-review writ application, such as the one in the instant case, does not toll the federal limitations period. *See id.* at 320 ("Filings that are not part of habeas or post-conviction proceedings do not invoke Section 2244(d)(2) tolling.... The only document Butler filed related to his untimely direct review application was the application itself, which is indisputably a part of his direct appeal proceedings."); *Johnson v. Cain*, Civ. Action No. 12-974, 2013 WL 5961101, at *4 (E.D. La. Nov. 7, 2013); *Allen v. Tanner*, Civ. Action Nos. 11-927 and 11-1601, 2011 WL 4344586, at *2 (E.D. La. Aug. 19, 2011), *adopted*, 2011 WL 4345081 (E.D. La. Sept. 15, 2011).

The state-court record shows that Gray had no properly filed application for post-conviction relief pending in the state courts during the applicable one-year period. The one-year federal limitations period continued to run uninterrupted and expired on January 22, 2019.

Petitioner's post-conviction application was filed with the state district court on November 3, 2019, more than the nine months after the one-year federal limitations period had already expired, and therefore could not possibly afford him any tolling benefit. *See*

8

*Madden v. Thaler*, 521 F. App'x 316, 320 (5th Cir. 2013); *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000); *Magee v. Cain*, Civ. Action No. 99–3867, 2000 WL 1023423, at *4 (E.D. La. Jul. 24, 2010) (citing *Williams v. Cain*, Civ. Action No. 00–536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000)), *aff'd*, 253 F.3d 702 (5th Cir. 2001). Simply put, once the federal limitations period expired, "[t]here was nothing to toll." *Butler*, 533 F.3d at 318.

### B. Equitable Tolling

The AEDPA's statute of limitations is also subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549, 2560, 177 L.Ed.2d. 130 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id*. at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005)); *see also Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002) (petitioner bears the burden of proof to establish entitlement to equitable tolling). (internal quotation marks omitted). A petitioner bears the burden of proof to establish entitlement to equitable tolling. *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

Gray does not argue that equitable tolling applies in this case. Furthermore, the record shows an inexplicable lack of diligence on his part and no extraordinary circumstances that would warrant equitable tolling. It is well-settled that mistake, ignorance of the law, and a prisoner's *pro se* status and lack of legal training do not constitute rare and exceptional circumstances warranting equitable tolling. *Johnson v. Quarterman*, 483 F.3d 278, 286 (5th Cir. 2007); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000); *see also Tate v. Parker*, 439 F. App'x 375 (5th Cir. 2011) ("The alleged extraordinary

9

circumstances endured by Tate, such as ignorance of the law, lack of knowledge of filing deadlines, a claim of actual innocence, temporary denial of access to research materials or the law library, and inadequacies in the prison law library, are not sufficient to warrant equitable tolling"); *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) ([E]quitable tolling "is not intended for those who sleep on their rights"). Accordingly, the Court finds that Gray is not entitled to equitable tolling.

C. *Actual Innocence*

In *McQuiggin v. Perkins*, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass ... [to excuse] the expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386, 133 S. Ct. 1924, 1928, 185 L.Ed.2d. 1019 (2013). The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare[.]" *Id*. To succeed on this claim, a petitioner must present a credible claim of actual innocence based on "new reliable evidence ... that was not presented at trial," and he "must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt" in light of that new evidence of his factual innocence. *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Because actual innocence provides an exception to the statute of limitations rather than a basis for equitable tolling, a petitioner who can make a showing of actual innocence need not demonstrate reasonable diligence in bringing his claim, though a court may consider the timing of the claim in determining the credibility of the evidence of actual innocence. *McQuiggin*, 133 S. Ct. at 1936.

Gray points to no new evidence that would show his actual innocence of the crimes for which he was convicted in counts one and two. Gray appears to claim that he is actually

innocent of the October 2014 robberies for which he was convicted in counts three through five. He has not, however, met the rigorous burden of proof imposed under the actual innocence exception based on newly proffered evidence. As "new" evidence in support of his actual innocence claim, Gray claims that arresting Officers Ted Raymond and Alvin Farris would have testified that they did not witness him leaving the bank. He claims unnamed doctors and nurses at West Bank Physicians would have testified that he was at the office at the time of the robbery. He claims an alleged video which would have shown him at West Bank Physicians' office at the time of the October 2014 robberies. Finally, he points to letters from Willie May Gray and Arisha Walker he obtained in March 2020.

The record facts as succinctly summarized by the Louisiana Fifth Circuit on direct appeal established the following:

> The charges in this case arise from robberies on two different dates at Iberia Bank located on Barataria Boulevard in Marrero. The first incident, which encompasses counts one and two in the bill of information, occurred on September 30, 2013.[1] On that date, Daniel Gannard, the branch manager, observed an individual with a pistol and a cloth over his face approach the bank, at which point he yelled out to alert the employees. Both Lynne Hebert, an assistant branch manager, and Mr. Gannard described that the robber rushed through the door waving a gun and shouting obscenities. After knocking his gun on Mr. Gannard's window and telling him, "Get the f**k up. I'm not playing with you," the perpetrator proceeded to the teller window and demanded money. In particular, the assailant pointed a gun at Jarod Murphy's head and commanded the teller to give him all the money. Mr. Murphy complied and started putting money into the white plastic grocery bag provided by the robber. During this encounter, the assailant noticed Trudy White, a teller who was in the drive-up window, and ordered her to also give him all the money. She likewise complied with his demand and assisted Mr. Murphy in putting the money in the white grocery bag.
>
> ---
> [1] Count one charged defendant with the armed robbery of Trudy White, and count two charged defendant with the armed robbery of Jarod Murphy.
>
> After they put the money in the bag, the robber turned to leave, yelling for everyone to get down and threatening to shoot. While the

11

robbery was in progress, Renee Rodney, a bank employee who was in the break room, saw what was transpiring, exited the back door, and ran to the restaurant next door for help. After someone from the restaurant called 9–1–1, Ms. Rodney went back outside and saw the robber exit the rear of the bank, "skipping" to his car, an older model gold Suburban, located behind the bank in a neighboring driveway.

Deputy Stan Kerr of the Jefferson Parish Sheriff's Office responded to the armed robbery call, and upon his arrival, he secured the scene and obtained initial statements from the victims and witnesses. When Detective Marc Macaluso, the investigating officer, thereafter arrived at the bank, he also spoke to the victims and witnesses. From these interviews, Detective Macaluso learned that the perpetrator was "a black male, approximately 5'5" to 5'10" in height. He was wearing a camouflage boonie hat, a red sweatshirt, sunglasses and a white cloth over his face." Additionally, Detective Macaluso learned that the assailant wore "a yellow, reflective, construction-style vest" and had a tattoo on his right hand. With this limited information, no suspects were developed, and the investigation was suspended. It was also determined that the perpetrator stole $4,720.00, none of which was recovered.

The second armed robbery, which encompasses counts three, four, and five in the bill of information, occurred on October 9, 2014.[2] At approximately 10:00 a.m., while Mr. Gannard was meeting with Ms. Hebert in his office, he saw an individual pass the window who resembled the perpetrator from the September 2013 armed robbery, prompting him to say, "He's back again, y'all. Heads up." The robber, whose face was fully covered, rushed into the bank armed with a black handgun.[3] After threatening Mr. Gannard, the assailant ran across the lobby, leapt over the teller counter, and yelled, "I want the money. I want all the money. Don't play with me. I will kill you."

[2] Count three charged defendant with the armed robbery of Trudy White; count four charged defendant with the armed robbery of Dana Silvey; and count five charged defendant with the armed robbery of Rachel Aiena.

[3] The witnesses described that the robber had on blue jeans, a dark colored shirt, a green bandanna covering his face, and another garment covering his head.

The perpetrator approached Rachel Aiena, grabbed money from her, put it in a white grocery bag, and then advanced towards Ms. White, the drive-up teller. Ms. White described that the assailant pointed the gun at her, demanded all the money, and threatened to kill her. Fearful for her life, Ms. White complied with the robber's demands and put the money in the "Walmart bag." The robber then went to Dana Silvey, another teller, and demanded money from her. She handed him the money from her cash drawer, and after putting it in the plastic bag, the robber demanded that she open the vault. Ms.

12

Silvey explained that she could not open the vault by herself, but he held the gun at her side saying, "I will f**king shoot you.  Open the f**king vault."   Being unable to enter the vault, the robber collected his money, jumped back over the counter, and exited the bank.

At the time of this robbery, Ms. Silvey happened to be on the phone with her husband, Oliver Silvey, a lieutenant with the Jefferson Parish Sheriff's Office. Ms. Silvey told her husband that the bank was getting robbed, and then she put the phone down but did not hang up. Lieutenant Silvey called in the robbery over his police radio.    After the perpetrator left the bank, Ms. Silvey got back on the phone with her husband and advised him that the robber left in a blue Suburban and was headed westbound on Oak Street.

Police officers, including Deputies Ted Raymond and Alvin Farris, responded to the armed robbery call, and upon arriving in the area, observed a blue Suburban matching the description of the suspect vehicle on Lapalco Boulevard.   A high speed chase ensued, which ended when the vehicle crashed into a house in the Lincolnshire Subdivision.    The suspect then jumped out of the vehicle holding the bag with the money in one hand and a gun in the other.   As he fled, the plastic bag got caught on the end of the bumper causing the bag to rip and the money to be scattered over the front lawn.   Deputy Raymond shouted at the suspect to stop, but he ignored the officer's order and jumped over a fence.   When Deputy Raymond again shouted to stop, the suspect turned and pointed the gun at him, at which point Deputy Raymond fired his weapon at the armed assailant. Despite being shot, the suspect fled, but after a short foot chase, was apprehended.    The suspect, who was identified as Brandon Gray, was thereafter handcuffed, advised of his rights, and transported to the hospital for treatment of his gunshot wounds.

Major Chad Pitfield of the Jefferson Parish Sheriff's Office, who was also at the scene of the stop, secured the money that was in the front yard and thereafter returned the stolen money, $15,667.00, to Iberia Bank.   In addition to recovering the money, the officers also discovered a pellet gun in the area of defendant's apprehension. Further, as a result of a search of the blue Suburban, the officers recovered a pair of gloves, a green bandanna, and a dark blue sweatshirt.

After learning that defendant had been transported to the hospital, Detective Macaluso went there with the intent to interview him.   Detective Macaluso reviewed the rights form with defendant but decided to discontinue the interview because of defendant's condition.[4]   However, later that day, defendant was transported to the

13

> detective bureau, at which time Detective Macaluso advised him of his rights and conducted an interview with him.
>
> > [4] At trial, Detective Macaluso testified that defendant was "wincing from pain" and was "shaking so bad."
>
> During the recorded interview, defendant confessed to the October 9, 2014 armed robbery, but he denied any involvement in the September 30, 2013 robbery. When shown photographs of the suspect and suspect vehicle from surveillance video from the 2013 robbery, defendant still denied his involvement and further denied having previously seen the vehicle. Detective Macaluso then confronted defendant with evidence that he was issued a traffic citation on November 5, 2011, driving a 1996 GMC gold Suburban, which belonged to his children's mother. The day after the interview, Detective Macaluso located this vehicle in the Lincolnshire neighborhood near the area where defendant was apprehended. As a result of a search of this vehicle, the police recovered a box of pellets and "construction-type equipment." Defendant was thereafter charged with both the September 30, 2013 and October 9, 2014 robberies.[27]

In rejecting Grays's direct appeal claim that the evidence was insufficient to support the convictions as to counts one and two, the court of appeal reasoned:

> In his first assignment of error, defendant challenges the sufficiency of the evidence used to convict him of the armed robberies of Ms. White (count one) and Mr. Murphy (count two) that occurred on September 30, 2013. While defendant maintains that the evidence was insufficient to prove all the elements of these two armed robberies, his argument focuses on the State's failure to prove his identity as the perpetrator.
>
> In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, 534, *writ denied*, 10-1357 (La. 1/7/11), 52 So.3d 885. A review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a

---

[27] *State v. Gray*, No. 17-KA-166 (La. App. 5 Cir. 12/20/17), 235 So.3d 1270, 1275-77; State Rec., Vol. 8 of 12.

14

reasonable doubt. Rather, a reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found the State proved the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240. It is not the function of the appellate court to assess credibility or re-weigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443.

To support a conviction for armed robbery, the State must prove beyond a reasonable doubt that defendant took "anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied*, 13-1115 (La. 10/25/13), 124 So.3d 1096.

In the present case, we find that the State presented sufficient evidence to prove beyond a reasonable doubt all the elements of the offense of armed robbery, including defendant's identity as the perpetrator. At trial, the State presented testimony that on September 30, 2013, a black male armed with a handgun came into the bank, demanded money, and took money from two different bank tellers, Ms. White and Mr. Murphy. Admittedly, the suspect had his face fully covered during the robbery, and therefore, none of the victims or witnesses were able to identify defendant as the robber.

However, several witnesses who were present at both robberies testified about the similarities between the perpetrators and the crimes. Ms. Hebert stated that she felt confident that the same person robbed the bank both times, specifically noting the similarities between the sound of the voice and the language used. In addition, Ms. Hebert noted that on both occasions, the assailant wore a "bandanna-type covering" over his face, carried a black automatic handgun, and used a white plastic grocery bag. Ms. White testified that the perpetrator of both robberies was an African–American male. She further observed that the assailants had the same exact voice and had similar "[m]annerisms, character, shouting, everything." Mr. Gannard likewise felt confident that the assailants were the same as evidenced by his announcement, "He's back again, y'all," when he saw the perpetrator of the October 2014 robbery approach the bank. During his testimony, Mr. Gannard explained, "The body language, the way he walked, the height, the way he got to the door and turned back and

15

> looked at me, it was all the same that happened a year prior to that." Further, the jury was able to view the surveillance video from both robberies and was able to determine whether to accept the witnesses' testimony concerning the similarities between the two robberies.[5]
>
> > [5] *See State v. Allen*, 00-13 (La. App. 4 Cir. 1/10/01), 777 So.2d 1252, *writ denied*, 01-703 (La. 5/3/02), 815 So.2d 92, where the Fourth Circuit found, under similar circumstances, that the evidence was sufficient to support the finding that the defendant was the perpetrator of two robberies that occurred at the same store on different dates.
>
> Additionally, defendant was connected to an older model gold Suburban, a car consistent with the getaway vehicle in the September 2013 robbery. When that vehicle was searched, construction gear, consistent with the reflective vest used in the September 2013 robbery, was found. Further, defendant had tattoos on his right hand consistent with the tattoos on the right hand of the perpetrator in the September 2013 robbery.
>
> Applying the *Jackson* standard, we find that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant committed the armed robberies of Ms. White and Mr. Murphy on September 30, 2013. Accordingly, the arguments relating to the sufficiency of the evidence are without merit..[28]

Gray has not submitted any affidavit or any other statement from any healthcare worker at West Bank Physicians. Nor did he submit the alleged time stamped video or log sheet confirming his presence at the office. He is correct that neither Deputy Raymond nor Deputy Farris testified that they witnessed Gray leave the bank on October 9, 2014. Rather, they both testified that they heard dispatch report a bank robbery at the Iberia Bank and that they pursued Gray, who was driving a blue Suburban with a temporary tag, which matched the description of the getaway car, in the vicinity of the robbery.[29] The jury, however, heard this evidence and, therefore, it is not new.

---

[28] *State v. Smith*, 2009 KA 0192, 2009 WL 3161957, at *8-9 (La. App. 1 Cir. 9/11/09), 761 So.2d 820 (Table); State Rec., Vol. 12 of 16.

[29] State Rec., Vol. 3 of 12, Trial Transcript, 9/21/16, at pp. 120-30, 138-41 (Raymond), 147-52, 157-59 (Farris).

Arisha Walker, Gray's girlfriend, stated in an unnotarized "affidavit" that she and Gray spoke on the phone on October 9, 2014, before his doctor's appointment as well as afterward.[30] She states that, when they were speaking as he was on his way to meet her at a party, she heard sirens and a gunshot.[31] According to Walker, Gray told her that police had shot his car and he told her to bring everyone outside because he was afraid for his life and was not going to stop driving until he made it to the residence.[32] Approximately 10 minutes later, Gray drove up, lost control of his vehicle and crashed into the neighboring house.[33] Walker claimed that Gray did not have a gun or anything else in his hands when he exited the vehicle and that Gray only fled when police started shooting.[34] Walker claimed that she told Gray's attorney that she wanted to testify, but that the attorney told her there was no need to do so as there was no way that Gray would be found not guilty.[35]

Willie May Gray, Gray's mother, states in her March 27, 2020 unnotarized "affidavit" that Gray dropped her off at a party.[36] Willie May Gray next saw her son crash into the house next door as he was being chased by police.[37] She states that Gray ran because he

---

[30] State Rec., Vol. 10 of 12, Arisha Walker Affidavit, 3/17/20.

[31] *Id.*

[32] *Id.*

[33] *Id.*, at pp. 1-2.

[34] *Id.,* at p. 2.

[35] *Id.*

[36] State Rec., Vol. 10 of 12, Willie May Gray Affidavit, 3/27/20.

[37] *Id.*

17

knew he was going to be shot.[38]  She states that she told Gray's counsel that she wanted to testify, but that he told her that Gray was going to spend the rest of his life in jail.[39]

Gray does not meet the rigorous burden of proof imposed under the actual-innocence exception based on the foregoing newly proffered evidence. Neither Walker nor Willie May Gray's statements are *reliable* new evidence establishing Gray's innocence as to counts three through five. First, neither "affidavit" is verified. Second, the affidavits are dated March 2020, more than six years after the 2014 bank robbery and nearly four years after Gray's trial. *See Strayhorn v. Booker*, 718 F. Supp. 2d 846, 874 (E.D. Mich. 2010) (noting that "[l]ong-delayed affidavits" are "treated with a fair degree of skepticism"). Third, both Walker and Willie May Gray's testimony would have been of limited value as their close family relationship would have made their testimony inherently suspect. *See Milton v. Secretary, Department of Corrections*, 347 F. App'x 528, 531 (11th Cir. 2009) (finding the reliability of petitioner's affidavits suspect because they were executed by relatives); *Talley v. Cain*, Civ. Action No. 08–3542, 2009 WL 916331, at *11 (E.D. La. Apr.6, 2009) (noting that alibi testimony from the petitioner's mother would have been "inherently suspect")). Further, Willie May Gray does not account for Gray's whereabouts after he dropped her off at the party until he crashed into the house during the police chase. Walker's affidavit does not account for the ten to fifteen minutes during which Gray was allegedly being seen by a doctor.

Even if the new evidence could have created a reasonable doubt in the minds of some

---

[38] *Id.*

[39] *Id.*

jurors, which is doubtful given the fact that the money stolen from the bank, some of which was still in the wrappers, was found at the site of the vehicle crash and Gray actually confessed to committing the robbery,[40] this evidence does not satisfy the exacting standard for proving actual innocence for which a petitioner must demonstrate that it is more likely than not that *no* reasonable juror would have convicted him of counts three through five in light of the new evidence. *Schlup*, 513 U.S. at 327 (emphasis added).

In sum, the instant petition was filed nearly nine months after the federal limitations period expired. Gray has not established any basis for statutory or equitable tolling nor has he established that the actual innocence exception applies. Therefore, his federal *habeas* corpus petition should be dismissed with prejudice as untimely.

## RECOMMENDATION

**IT IS RECOMMENDED** that Brandon Gray, Sr.'s application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE as time-barred**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[41]

---

[40] State Rec., Vol. 4 of 12, Trial Transcript, 9/21/16, at pp. 128-29, 133, 152, 171-74, 200, 203, 215-16; State Rec., Vol. 4 of 12, Trial Transcript, 9/22/16, at pp. 50, 78.

[41] *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.

New Orleans, Louisiana, this   5th   day of   January  , 2022.

                                               **MICHAEL B. NORTH**
                                     **UNITED STATES MAGISTRATE JUDGE**